IN THE UNITED STATES DISTRICT COURT
FOR DISTRICT OF NEW HAMPSHIRE

|  |  |
|---|---|
| IN RE APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER PURSUANT TO 18 U.S.C. § 2703(d) DIRECTING CELLCO PARTNERSHIP DBA VERIZON WIRELESS, AT&T CORP., SPRINT CORP., T-MOBILE US, INC., AND US CELLULAR TO DISCLOSE RECORDS | 1:22-mc-04-AJ<br><br>**Filed Under Seal – Level II** |

APPLICATION OF THE UNITED STATES
FOR AN ORDER PURSUANT TO 18 U.S.C. § 2703(d)

The United States of America, by and through its undersigned counsel, respectfully submits under seal this *ex parte* application for an Order pursuant to 18 U.S.C. § 2703(d). The proposed Order would require Cellco Partnership d/b/a Verizon Wireless ("Verizon Wireless"), AT&T Corporation ("AT&T"), Sprint Corp. ("Sprint"), T-Mobile US, Inc. ("T-Mobile") and US Cellular ("US Cellular") ("the Service Providers") to disclose certain records and other information pertaining to the cellular telephone towers described in Part I of Attachment A to the proposed Order. The records and other information to be disclosed are described in Part II of Attachment A to the proposed Order. In support of this application, the United States asserts:

**LEGAL BACKGROUND**

1.  The United States may use a court order issued under 18 U.S.C. § 2703(d) to require a provider of electronic communication service to disclose records or other information pertaining to a subscriber to or customer of such service, not including the contents of any communications. Cellular service providers are providers of an electronic communications service, as defined in 18 U.S.C. § 2510(15). Accordingly, the United States may use a court

1

order issued under 18 U.S.C. § 2703(d)[1] to require the Service Providers to disclose the items described in Part II of Attachment A, which are "record[s] or other information pertaining to a subscriber to or customer of such service." 18 U.S.C. § 2703(c)(1).

2. This Court has jurisdiction to issue the proposed Order because it is "a court of competent jurisdiction," as defined in 18 U.S.C. § 2711. See 18 U.S.C. § 2703(d). Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated. See 18 U.S.C. § 2711(3)(A)(i).

3. A court order under § 2703(d) "shall issue only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that … the records or other information sought, are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d). Accordingly, the next section of this application sets forth specific and articulable facts showing that there are reasonable grounds to believe that the records and other information described in Attachment A are relevant and material to an ongoing criminal investigation.

---

[1] This application seeks the disclosure of information about all phones that utilized one or more identified cell phone towers during a given timeframe, otherwise known as "tower dump" information. In Carpenter v. United States, 138 S. Ct. 2206 (2018), the Supreme Court held that the acquisition of historical cell-site location information for a period of seven days or more relating to a particular, identified cell phone required a warrant, id. at 2217 n.3; however, the Court expressly declined to reach the question of whether the acquisition of tower dump information constituted a Fourth Amendment search that required a warrant, id. at 2220. A tower dump reveals a phone's location only during a limited time and only then if it is in a specific location serviced by the cell tower(s) identified by the government. Unlike the historical cell-site location information for a particular phone at issue in Carpenter, tower dump information does not provide a record of a phone's location over multiple days and thus does not provide the sort of "all-encompassing record of the holder's whereabouts" that can provide an "intimate window into a person's life" that concerned the Court in Carpenter. See id. at 2217. Because tower dump information is qualitatively different from the historical cell-site location information for a particular phone at issue in Carpenter, the Government respectfully submits that its acquisition is not a Fourth Amendment search and can be accomplished via the proposed 2703(d) order.

## FACTS ABOUT THE ONGOING CRIMINAL INVESTIGATION

### ATTEMPTED BURGLARY OF NEXT LEVEL FIREARMS

4. On January 22, 2022, at approximately 3:49 AM, a dark colored sedan, turned right into the shopping plaza at 254 N. Broadway, Salem, NH from NH Route 28 Northbound (Rockingham Road). The vehicle backed into a parking spot in front of federal firearms licensee (FFL) Next Level Firearms located at suite #107. A view of the rear license plate gave a partial registration which began with "2" and ended in "86" and is believed to be a possible Massachusetts license plate.

5. The suspect vehicle then pulled forward and backed into a parking spot closer to the front door of the FFL and partially off of camera view.

6. At approximately 03:50 AM, a passenger (FNU LNU1; U/M) appeared to exit the right front passenger door. LNU1 appeared to be an average build, possibly Hispanic male, wearing a black hooded sweatshirt, black sweatpants and white, unlaced hightop sneakers. LNU1 wore a dark face covering, covered by the hood of his sweatshirt, blue surgical-style gloves, and appeared to hold a hammer in his right hand as he approached the FFL front door. LNU1 would later use the hammer to smash the glass of the front door of the FFL.

7. At approximately 03:50 AM, a second suspect (FNU LNU2; U/M) appeared into camera view. It is presumed LNU2 exited the driver's side of the vehicle, as no other vehicles were observed in the parking lot. It was unknown if LNU2 was the operator or rear driver's side passenger of the suspect vehicle. LNU2 appeared to be an average build, possibly Hispanic male, wearing a dark gray hooded sweatshirt, black sweatpants and gray sneakers with black soles. LNU2 wore a dark face covering, covered by the hood of his sweatshirt, blue surgical-style

gloves, and appeared to hold a hammer in his right hand. LNU1 broke the glass of the front door of the FFL and LNU2 entered the FFL first, followed by LNU1.

8. A third suspect (FNU LNU3; U/M) appeared into camera view. It is presumed LNU3 exited the driver's side of the vehicle, as no other vehicles were observed in the parking lot. It was unknown if LNU3 was the operator or rear driver's side passenger of the suspect vehicle. There were no further indications of additional suspects inside of the vehicle. LNU3 appeared to be an average build male, wearing a black hooded sweatshirt, black pants with visible lighter-color fabric visible at the waistline, and black shoes. LNU3 wore a dark colored face covering, covered by the hood of his sweatshirt, blue surgical-style gloves and carried what appeared to be numerous bags. LNU3 entered into the FFL through the front door as well.

9. Although all suspects wore masks, they are all presumed to be male based upon gait and stature. Once inside of the store, LNU1 and LNU2 went off camera view to the left camera side, where a glass door to a lounge was later found smashed. It was suspected LNU1 and/or LNU2 utilized the hammers they held to smash the glass.

10. Inside of the FFL there was a metal grate from wall to wall and floor to ceiling. This grate separated the lobby area seen on camera view from the store display cases containing firearms, therefore the suspects were unable to access the firearms within the store. The suspects briefly looked around the lobby at boxes of firearms accessories and then exited the FFL at 03:51:03 AM. The suspects were inside of the store for less than one minute.

11. LNU2 exited the store first and ran to the driver's side of the suspect vehicle. LNU3 exited the store second and ran to the driver's side of the suspect vehicle. It could not be determined where LNU2 or LNU3 were seated inside of the suspect vehicle due to being out of camera view.

12. LNU1 exited the store last and entered into the front passenger's door of the suspect vehicle.

13. At approximately 03:51 AM, the suspect vehicle displayed brake lights, which was indicative that one of the suspects who entered the store was also the operator of the suspect vehicle and no additional suspects were waiting inside of the vehicle.

14. At 03:51:15 AM, the suspect vehicle drove away from the FFL and turned left onto NH Route 28 Southbound and out of view.

## ATTEMPTED BURGLARY OF STATELINE FIREARMS

15. On that same day at approximately 4:10 AM, what is believed to be the same three male suspects from the Next Level Firearms attempted burglary, attempted to break into Stateline Guns Ammo & Archery, a federal firearms licensee dealer located at 153 Plaistow Road in Plaistow, NH. Surveillance video shows that two of the suspects used hammers on the padlocks to the rollup security gate covering the front entrance doors but were unsuccessful in dislodging them. The same two suspects then used their hammers to break a front glass window, but were unsuccessful in gaining entry due to the metal bars secured to the inside of the window frame. The suspects arrived in what appeared to be a small, dark colored sedan. Two of the suspects also had bags matching those carried by the suspects at the Next Level Firearms attempted burglary earlier that morning. No entry was made into the building and no firearms were stolen. The suspects were present at, or in the area of, Stateline Guns Ammo & Archery for approximately eleven minutes.

16. Stateline Guns Ammo & Archery is located approximately thirteen miles from Next Level Firearms and would take approximately twenty-one to twenty-three minutes to drive between the store by car depending on the route taken (according to Apple Maps App).

## ATTEMPTED BURGLARY OF COSTA ARMS

17. Later that same day, employees from Costa Arms, a FFL, located at 15 Church Street in Kingston, NH reported to Kingston, NH Police that when they arrived for work that morning they noted unknown suspect(s) attempted to gain access to the premises by ramming open a fence gate at the side of the business, presumably with a vehicle, to gain access to the rear area of the business. It was also noted that there was damage to a rear entrance doorknob consistent with someone trying to gain entry who did not have access. No entry was made into the building and no firearms were stolen. It was later determined that no security video of the event was captured and the timeframe could only be narrowed to between approximately 6:00 PM on January 21, 2022, and approximately 9:00 AM on January 22, 2022 based upon the arrival and departure time of the store employees. However, as will be discussed herein, the vehicle sustained damage at some point between the previous two attempted burglaries and January 23, 2022. Video surveillance of the vehicle at Stateline Guns Ammo & Archery and Next Level Firearms shows that the vehicle has not sustained damage consistent with ramming the fence. Therefore, I believe that the attempted burglary of Costa Arms likely happened after the previous two attempts.

18. According to a review of the distance and time required to travel between Stateline Guns Ammo & Archery and Costa Arms, they are approximately seven to nine miles apart and travel time between the two would take approximately twelve to seventeen minutes.

## ATTEMPTED BURGLARY OF SHOOTERS OUTPOST

19. On January 23, 2022, at 05:01:37 AM, a dark sedan pulled into the front of Shooters Outpost, a firearms dealer located at 1158 Hooksett Road, Hooksett NH, backed into a parking spot in the front of the store, while occupants from the vehicle walked around the store.

6

20. At 05:13:44 AM, the suspect vehicle, drove into the rear parking lot and backed up to the rear loading dock and employee door. Four males were captured on video surveillance attempting to gain entry into the store via smashing a window by the rear door, but were unable to gain access into the store. Surveillance video allowed agents to partially identify a plate and an ATF agent believed it began with 25 and ended with 86, though the video is hard to make out.

21. At 05:17:12 AM, the vehicle fled the scene and traveled in an unknown direction, not captured on video surveillance.

22. The suspect vehicle and three of the four suspects matched the description and/or wore similar clothing from the attempted burglaries that transpired the day before on January 22, 2022, in Salem, Plaistow and Kingston, NH. The rear passenger was wearing white unlaced hightop shoes, a black hooded sweatshirt and black sweatpants consistent with the style of clothing worn by LNU1 at the Next Level Firearms and Stateline Guns Ammo & Archery attempted burglaries the day before. Another suspect wore a black hooded Champion brand sweatshirt, black sweatpants and what appeared to be the same two-toned shoes worn by LNU2 at the Next Level Firearms and Stateline Guns Ammo & Archery attempted burglaries the day before. A third suspect wore a black hooded sweatshirt, black pants and black shoes with a lighter colored fabric undergarment consistent with the style of clothing worn by LNU3 at the Next Level Firearms and Stateline Guns Ammo & Archery attempted burglaries the day before. The driver of the suspect vehicle appeared to be wearing camouflage pattern hooded sweatshirt and sweatpants.

WITNESS CONTACTS WITH ATTEMPTED BURGARY SUSPECTS

23. On January 23, 2022, at approximately 06:30 AM, the business owner, Thomas Saad, of Tree Line Property Services, located at 92 Rockingham Road, Derry, NH, encountered

the suspect vehicle in the business' parking lot occupied by what he described as three to four light-skinned African-American or Hispanic males in their late teens to early 20's. Mr. Saad took a photo of the suspect vehicle, which was observed to have damage to the front left portion of the bumper. The damage was consistent with the damage that could have been sustained from ramming a locked gate at the attempted burglary at Costa Arms in Kingston, NH on January 22, 2022. The vehicle bore Massachusetts license plate 2SFW86.[2]

      24.     In reviewing the photograph taken by Mr. Saad, the operator of the suspect vehicle can be observed wearing a camo-style hooded jacket/sweatshirt that was similar to that observed worn by the operator of the suspect vehicle on video surveillance at Shooters Outpost earlier that morning.



---

[2] I believe this is consistent with the plates observed on surveillance footage. Although one agent believed the plate began 25, I believe that he mistakenly read the S as a 5.

25. On that same day, ATF S/A John Cook met with the witness, Thomas Saad, who had spoken to the suspects when he arrived at work that morning. S/A Cook viewed the video surveillance and noted that the suspect vehicle arrived at Tree Line Property Service at approximately 6:13 AM. S/A Cook further noted that a suspect exited the vehicle at approximately 6:15 AM and walked in the direction of the B&H Oil Co., a gas station and convenience store located at 36 S Main Street in Derry, NH. That suspect was wearing what appeared to be a camouflage pattern jacket. The vehicle stayed at the Tree Line Property Services until the suspect in the camouflage pattern jacket returned at approximately 6:25 AM. The vehicle stayed at the Tree Line Property Services until approximately 6:31 AM when Mr. Saad arrived prompting the suspects and suspect vehicle to leave.

## REVIEW OF VIDEO SURVEILLANCE FROM B&H OIL CO.

26. On January 23, 2022, S/A Patrick Dawley went to B&H Oil Co., to review their security video footage from earlier that morning. The suspect arrived at 6:17 AM wearing the same (later determined to be Nike brand) camouflage pattern hooded sweatshirt and sweatpants as the operator of the suspect vehicle at Shooter Outpost earlier that morning and also present at Tree Line Property Service shortly before. The suspect purchased a gallon of water and a quantity of gasoline with cash. The suspect then walked out to the parking lot, took a drink of water from the gallon water jug he purchased, and poured it out on the ground. The suspect then used the empty gallon jug of the water it originally contained. The suspect subsequently put gasoline into the empty gallon water jug. The suspect then walked back in the direction of Tree Line Property Service. The suspect left B&H Oil Co. at approximately 6:24 AM.

27. On or about January 23, 2022, the ATF became aware that a vehicle with Massachusetts License Plate 2SFW86 was reported stolen out of Boston on January 8, 2022

when it was parked outside a Burger King located at 210 Brighton Avenue, Brighton, Massachusetts at approximately 6:40 p.m. The vehicle description is consistent with that of the vehicle seen on surveillance cameras at the attempted burglaries.

### FACTS ABOUT CELL TOWERS IN GENERAL

28. Many cellular service providers maintain antenna towers ("cell towers") that serve specific geographic areas. Each cell tower receives signals from wireless devices, such as cellular phones, in its general vicinity. By communicating with a cell tower, a wireless device can transmit or receive communications, such as phone calls, text messages, and other data. When sending or receiving communications, a cellular device does not always utilize the cell tower that is closest to it.

29. Cellular phones are assigned unique telephone numbers. In addition, all cellular devices are identified by one or more unique identifiers. Depending on the cellular network and the device, the unique identifiers for a cell phone could include an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI").

30. Cellular providers routinely, and in their regular course of business, maintain historical records that allow them to determine which wireless devices used cellular towers on the cellular provider's network to send or receive communications. For each communication sent or received via the wireless provider's network, these records may include (1) the telephone call number and unique identifiers for the wireless device that connected to the provider's cellular tower and sent or received the communication ("the locally served wireless device"); (2)

the cellular tower(s) on the provider's network, as well as the "sector" (*i.e.,* face of tower), to which the locally served wireless device connected when sending or receiving the communication; and (3) the date, time, and duration of the communication. These records may also include the source and destination telephone numbers associated with the communication (including the number that was called or that called the locally served wireless device) and the type of communication (*e.g.,* phone call or SMS text message) that was transmitted. On December 8 and 9, 2021, the United States sent preservation letters pursuant to 18 U.S.C. § 2703(f) to the Service Providers; these letters requested that the providers preserve the data identified in Attachment A. In general, cellular providers have the ability to query the historical records described above to determine the cellular device(s) that were connected to a particular cellular tower on their network during a given period of time and to produce such information to the government.

31. Based on the above facts, there is reason to believe that the records described in Attachment A would identify which wireless devices connected to, and thus were in the general vicinity of, the locations discussed herein. This information, in turn, will assist law enforcement in determining which persons were present for the incident.

## REQUEST FOR ORDER

32. The facts set forth in the previous section show that there are reasonable grounds to believe that the records and other information described in Attachment A are relevant and material to an ongoing criminal investigation. Specifically, these items will help the United States to identify and locate the individual(s) who are responsible for the events described above and to determine the nature and scope of their activities, as well as to identify and locate

witnesses. Accordingly, the United States requests that the Service Providers be directed to produce all items described in Part II of Attachment A to the proposed Order.

33. The United States further requests that the Order require the Service Providers not to notify any person, including individuals whose wireless devices connected to the cellular telephone towers described in Part I of Attachment A, of the existence of the Order for one year from the date of the Court's Order. *See* 18 U.S.C. § 2705(b). Such a requirement is justified because the Order relates to an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation, and its disclosure may alert the targets to the ongoing investigation. Accordingly, there is reason to believe that notification of the existence of the Order will seriously jeopardize the investigation, including by giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, intimidate potential witnesses, or endanger the life or physical safety of an individual. *See* 18 U.S.C. § 2705(b)(2), (3), (5). Some of the evidence in this investigation is stored electronically. If alerted to the investigation, the subjects under investigation could destroy that evidence, including information saved to their personal cellular devices, computers.

        Respectfully submitted,

        JOHN J. FARLEY
        United States Attorney

        */s/*Georgiana L. MacDonald
        Georgiana L. MacDonald
        Assistant United States Attorney

Dated: January 25, 2022

## ATTACHMENT A

I.  **The Cell Towers**

This Order applies to certain records and information associated with the following cellular telephone towers ("cell towers") at the following dates and times:

| Cell Towers | Dates | Times |
|---|---|---|
| The cell towers that provided cellular service to 254 N. Broadway, Salem, NH 03079 | January 22, 2022 | 3:35 a.m. – 4:05 a.m. ET |
| The cell towers that provided cellular service to 153 Plaistow Road, Plaistow, NH 03865 | January 22, 2022 | 4:00 a.m. – 4:30 a.m. ET |
| The cell towers that provided cellular service to 15 Church Street, Kingston, NH 03848 | January 22, 2022 | 4:10 a.m. – 5:00 a.m. ET |
| The cell towers that provided cellular service to 1158 Hooksett Road, Hooksett, NH 03106 | January 23, 2022 | 4:55 a.m. – 5:25 a.m. ET |
| The cell towers that provided cellular service to 92 Rockingham Road, Derry, NH 03038 | January 23, 2022 | 6:08 a.m. – 6:38 a.m. ET |
| The cell towers that provided cellular service to 210 Brighton Avenue, Brighton, MA | January 8, 2022 | 6:20 a.m. – 7:00 a.m. ET |

II. **Records and Other Information to Be Disclosed**

For each cell tower described in Part I of this Attachment, the Service Providers named in the Order are required to disclose to the United States all records and other information (not including the contents of communications) about all communications made using the cell tower during the corresponding timeframe(s) listed in Part I, including the records that identify:

a. the telephone call number and unique identifiers for each wireless device in the vicinity of the cell tower ("the locally served wireless device") that registered with the cell tower, including Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), and International Mobile Equipment Identities ("IMEI");

b. for each communication, the "sector(s)" (i.e. the face(s) of the tower(s)) that received a radio signal from the locally served wireless device;

c. the date, time, and duration of each communication

d. the source and destination telephone numbers associated with each communication (including the number of the locally served wireless device and the number of the telephone that transmitted a communication to, or to which a communication was transmitted by, the locally served wireless device); and

e. the type of the communication transmitted through the tower (such as phone call or text message).

f. Any and all specialized location records within 1000 meters from the addresses provided above related to all calls, SMS/MMS, and/or data connections. Records referred to as NELOS, RTT, Timing Advance, and/or PCMD by different cellular carriers. Data may show cell sites, sectors, distance measurements, and/or estimated handset locations

These records should include records about communications that were initiated before or terminated after the timeframe(s) identified in Attachment A.I if some part of the communication

2

occurred during the relevant timeframe(s) listed in Attachment A.I.